**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROSA JONES, ADMINISTRATIX of the )
ESTATE of MARC JONES, DECEASED, )
                                 )
            Plaintiff,           )          2:19-cv-00050
                                 )
            v.                   )
                                 )
SWEPI L.P. et al.,               )
                                 )
            Defendant.           )

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Plaintiff's deceased husband, Marc Jones ("Jones"), was killed on October 27, 2018, while working on a snubbing unit at an oil and gas well site known as Kinnan Well. Following this incident, Plaintiff, administratrix of Mr. Jones's estate, sued SWEPI, LP and Shell Energy Holding GP, LLC (collectively "Shell")[1,2] and Consolidated Rig Works, L.P. ("CRW"). The following motions are currently pending before the Court for resolution at this time: a Motion for Summary Judgment filed by CRW (ECF No. 140) and a *Daubert* Motion to preclude the testimony of Plaintiff's expert Mark Mazzella, filed by CRW (ECF No. 138). For the reasons that follow, each of these Motions is DENIED.

---

[1] Shell Energy Holding GP, LLC ("Shell") is the partner of SWEPI, LP, with SWEPI being the owner and operator of the subject oil and gas well site and the named party to the contract with Deep Well. (ECF No. 129, at 1)

[2] Shell and Plaintiff advised the Court that they resolved Plaintiff's claims as to Shell on November 30, 2022. Accordingly, the Court need not address the motions relating to Shell and Plaintiff and only focuses on the claims relative to CRW and Plaintiff in this Opinion.

I.    **BACKGROUND**[3]

Shell operated an oil and gas well site in Tioga County, Pennsylvania, known as Kinnan Well. (ECF No. 130, ¶ 5.) Plaintiff's deceased husband, Marc Jones, was an employee of Deep Well Services ("DWS"), a company with whom Shell contracted to perform snubbing work at Kinnan Well. (*Id.* ¶¶ 7, 8, 30.) DWS was contracted to perform all snubbing work including supplying all necessary equipment and personnel. (*Id.* ¶ 8.) On October 27, 2018, Jones was fatally injured after being struck by a jack assembly on a snubbing unit (Snub 10) at the Kinnan Well. (*Id.* ¶¶ 29, 30, 42.)

Snubbing is a process in which rubber "frac plugs"—which had been placed during the hydraulic fracturing or "fracking" process for drilling for natural gas to hold back underground pressure and prevent natural gas from escaping—are drilled out of the well, allowing natural gas to flow up to the surface. (*Id.* ¶ 4.) Snubbing is performed using a snubbing unit. (*Id.* ¶ 4.) The snubbing unit involved in Jones's accident, Snub 10, was manufactured by CRW. (*Id.* ¶ 25; ECF No. 141, ¶ 7.) To construct Snub 10, and per DWS's directions, CRW reverse-engineered the design of Snub 9, which was another snubbing unit belonging to DWS and manufactured by a different entity. (ECF No. 141, ¶ 8.) CRW added a counterbalance to the Snub 10. (*Id.* ¶ 11.) One purpose of the counterbalance is to help the machine operate more smoothly and protect the machine's condition and longevity by causing the involved assembly to move in a slower or more controlled fashion (*id.* ¶ 12); Plaintiff asserts, and CRW denies, that another purpose of the

---

[3] The following facts are undisputed unless otherwise noted. Disputed facts are viewed in the light most favorable to the nonmoving party in accordance with *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). For efficiency, the Court omits separate citations to Plaintiff's Response to Defendants' Concise Statements of Material Facts (ECF Nos. 130, 141) where Plaintiff clearly admits to a fact contained in Defendants' Concise Statements of Material Facts. Similarly, the Court omits separate citations to Defendants' Response to Plaintiff's Concise Statements of Material Facts (ECF Nos. 153, 157, 189, 188) where Defendants clearly admit to a fact contained in Plaintiff's Concise Statements of Material Facts. The Court further omits duplicative citations to both parties' statements of facts where the parties allege identical facts.

counterbalance is a safety-related purpose of protecting against an unexpected movement of the jack assembly (ECF No. 189, at 12). DWS expressed concerns that the counterbalance made Snub 10 work more slowly and asked CRW to remove the counterbalance. (ECF No. 141, ¶ 16.) CRW did not remove the counterbalance, but it installed a bypass on the counterbalance unit that would allow the operators of the snubbing unit to override the counterbalance when desired. (*Id.* ¶¶ 17–19.) CRW did not update the Snub 10 product manual to include the existence and functionality of the bypass valve. (ECF No. 189, ¶ 216.)

Before beginning each snubbing shift, including the late night shift during which Jones was killed, the DWS crew completed a job safety analysis ("JSA") form that outlined the work to be performed during that shift, potential safety risks that could arise, and mitigation plans for those hazards, and had a pre-job safety meeting to discuss those topics. (ECF No. 130, ¶¶ 18, 19.) Shell had an On-Site Representative ("OSR") at the Kinnan Well Site who would attend the pre-job safety meetings to reiterate Shell's safety policies. (*Id.* ¶¶ 19, 20.) One of Shell's safety policies was that if a planned task ever changed as it was being performed, the crew should stop work and conduct a task safety analysis ("TSA") to discuss the change. (*Id.* ¶¶ 22–23.) Plaintiff sometimes refers to the TSA process as performing a "step 7 analysis." (ECF No. 188, at 12.)

During the shift when the fatal incident occurred,[4] two components of Snub 10—the jack assembly and the rotary—stopped functioning. (ECF No. 130, ¶ 32.) The DWS crew was able to fix the jack assembly but not the rotary. (*Id.* ¶ 33.) The crew met in their trailer to discuss how to troubleshoot the rotary issue and came up with the plan whereby Jones and Steven Monroe, another member of the DWS snubbing crew, would install a pressure gauge on the rotary handle hydraulic

---

[4] The incident involved here occurred in the early morning hours of October 27, 2018: Monroe and Jones discussed the issue with the rotary at approximately 1:55 a.m. (ECF No. 130, ¶ 33) and Jones was pronounced dead at 3:16 a.m. (ECF No. 36, ¶ 15).

line. (*Id.* ¶¶ 34–37.) The rotary hydraulic line is one of several hydraulic lines on the snubbing

unit; the hydraulic lines are accessible under the control panel in the work basket of the snubbing

unit. (*Id.* ¶¶ 34, 41.) In discussing this plan, consistent with the "task safety analysis" procedure,

the crew identified safety risks that Jones and Monroe would face in performing that task, including

getting up to the elevated work basket and making sure the power pack was off, which was

important because they were to open up a hydraulic connection as part of installing the pressure

gauge on the rotary hydraulic line. (*Id.* ¶ 36.) Only DWS employees were present at the meeting

and involved in devising that plan. (*Id.* ¶¶ 33, 34, 36.) The plan discussed during this meeting was

then communicated by DWS Supervisor, Jake Wansor, to the Shell OSR, Morgan Davis. (*Id.* ¶¶

31, 37.)

Jones and Monroe then went to the work basket of the snubbing unit to perform the

discussed task. (*Id.* ¶ 38.) To make it easier to access the rotary hydraulic line, Jones and Monroe

did two things: first, they raised the jack assembly eight feet above them to give themselves more

space to work; and second, they loosened/disconnected a different hydraulic line to help them

better access the rotary hydraulic line. (*Id.* ¶¶ 39, 41.) Neither of those two actions had been

discussed during the work planning meeting in the trailer. (*Id.* ¶¶ 37, 39–41.) Oil began to leak

from the loosened hydraulic line, which prompted Jones to step in the area under the raised jack

assembly to investigate the leak. (*Id.* ¶ 42.) The jack assembly then rapidly descended, hit Jones,

knocked him down, and trapped him under the jack assembly. (*Id.*) Jones died from his injuries.

(*Id.*)

At the time of the incident, the bypass was engaged, and the counterbalance was thus

overridden. (ECF No. 154-2, ¶¶ 46, 48.) Plaintiff asserts that the existence and engagement of the

bypass caused the jack assembly to rapidly descend onto Jones. (ECF No. 189, ¶ 156.) CRW denies

this and states instead that the disconnection of the hydraulic line that held the jack in the raised position is what caused the jack to descend. (ECF No. 141, ¶ 83.) However, the record contains evidence to show that the bypass was at least part of the cause of the descent of the jack: Caleb Fulks, CRW's own VP of engineering, testified that "had th[e] [counterbalance] mechanism not been bypassed, the counterbalance on snub 10 would have prevented the jack from falling under the circumstances of [Jones's] accident." (ECF No. 154-2, at 149.)

Plaintiff filed this lawsuit in state court on December 10, 2018. (ECF No. 1, at 1.) In January 2019, the case was removed to this Court. (ECF No. 1.) Plaintiff asserted against Shell various theories of liability, including common law negligence, and against CRW theories of negligence, strict product liability, and breach of warranty. (ECF No. 36.) Shell and CRW filed crossclaims against each other for contribution/indemnification. (ECF Nos. 40, 47.) Shell filed a Motion for Summary Judgment (ECF No. 144-1.) CRW filed a *Daubert* Motion to preclude the testimony of Plaintiff's expert Mark Mazzella (ECF No. 138) and a Motion for Summary Judgment (ECF No. 140). The Court held oral argument on these motions on June 8, 2022. (ECF No. 196.) The Court has reviewed all the materials for those now pending Motions and will consider each now involved Motion in turn, beginning with the Motion for Summary Judgement.

## II.     CRW'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS

CRW filed a Motion for Summary Judgment and supporting materials, seeking dismissal of all Plaintiff's claims against it.[5] (ECF Nos. 140, 141, 142, 143.) CRW's motion is based on the arguments that (1) Plaintiff cannot establish that Snub 10 was unsafe for its intended use and intended users; (2) CRW did not design the product; (3) the product was being misused at the time

---

[5] CRW sought summary judgment on Plaintiff's claims of breach of express warranty, implied warranty of merchantability, and implied warranty of fitness for a particular purpose (ECF No. 140, ¶ 9), and fully briefed its argument with respect this these claims (ECF No. 142, at 22–25.) Plaintiff did not respond to these arguments and affirmatively dropped these warranty claims during oral argument.

of the accident; and (4) Plaintiff's conduct was highly reckless and unforeseeable. (ECF No. 140 ¶ 7.) CRW also sought summary judgment on all of Plaintiff's claims because of it asserts that Plaintiff could not provide competent expert testimony to establish a product defect or foreseeability of this accident. (*Id.* ¶ 8.)

Plaintiff filed a Response brief (ECF No. 154) and an Amended Statement of Material Facts (ECF No. 189). CRW then filed a Reply Brief (ECF No. 169) and a Reply Statement of Material Facts (ECF No. 192). Finally, Plaintiff filed a Surreply Brief (ECF No. 175). and a Surreply Statement of Material Facts (ECF Nos. 176, 178). Upon reviewing these materials, the Court concludes there is sufficient evidence in the record for a fact finder to conclude that CRW is liable to Plaintiff under a theory of product liability and/or negligence for its role in providing Snub 10 to DWS. Thus, the Court concludes that CRW is not entitled to judgment as a matter of law on Plaintiff's claims against it and thus DENIES CRW's motion as to these claims.

### A.   Standard of Review: Summary Judgment

A court may grant summary judgment if the movant shows that there are no genuine disputes of material facts, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment must be granted "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). But "[t]he mere existence of a scintilla of evidence in support of the [non-movant's]

position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

The moving party bears the initial burden of demonstrating that there are no genuine disputes of material facts. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362 (3d Cir. 1992) (citing *Celotex*, 477 U.S. at 323). If a moving party satisfies this burden, the opposing party must designate specific facts in the record that show that there is a genuine, material factual dispute to be resolved at trial. *Celotex*, 477 U.S. at 324. The non-moving party may rely on its own affidavits or on the "depositions, answers to interrogatories, and admissions on file" to designate these facts, but may not rely solely on its own pleadings. *Id.*; *see also Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989). "A fact is "material" if, under the substantive law of the case, it is outcome determinative." *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 129 (3d Cir. 1998) (citing *Anderson*, 477 U.S. at 247–48). Thus, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

### B. Discussion

### 1) There Is Enough Evidence in the Record for a Jury To Determine That Snub 10 Was Defective.

Strict product liability claims in Pennsylvania, as governed by the Restatement (Second) of Torts § 402A, require Plaintiff to prove that "the product was defective, the defect existed when it left the defendant's hands, and the defect caused the harm." *Igwe v. Skaggs*, 258 F. Supp. 3d 596, 609 (W.D. Pa. 2017) (citing *High v. Pennsy Supply, Inc.*, 154 A.3d 341, 345–46 (Pa. Super. 2017)). "A product may be defective based on a manufacturing defect, design defect, or failure-to-warn defect." *Id.* The question of whether a product is defective is a question for the jury and

can only be removed from the jury when "it is clear that reasonable minds cannot differ on the issue." *Tincher v. Omega Flex, Inc.* 104 A.3d 328, 407 (Pa. 2014) (internal citations and internal quotations omitted). Plaintiff alleges all three theories of strict product liability against CRW, arguing that the snubbing unit involved in the incident, Snub 10, was defective. (ECF No. 36 ¶¶ 28–37.)

CRW argues that it is entitled to judgment as a matter of law because Plaintiff cannot establish that Snub 10 was unsafe for its intended use and intended users. (ECF No. 140 ¶ 7.) On that point, CRW incorporates its *Daubert* motion to further argue that Plaintiff lacks a competent expert witness to establish a product defect or foreseeability of this accident. (*Id.* ¶ 8.) For the reasons explained below in the Court's analysis of CRW's *Daubert* Motion, the Court concludes that Mr. Mazzella can competently testify regarding the asserted defects of Snub 10 and the foreseeability of this accident (as that term is used in the context of this type of claim).

The Court further concludes that there is a genuine issue regarding the fact of whether Snub 10 was defective. Specifically, the Court is persuaded by (among other things) the fact that Caleb Fulks and Jeremy Lawrence, both management-level employees of CRW, both appear to admit that the Snub Unit with the bypass valve was dangerous and the presence of that bypass might have caused this incident to occur. Specifically, Caleb Fulks, CRW VP of Engineering, agreed in his deposition with the statement that "the counterbalance bypass [] effectively negat[ed] any safety benefit from the counterbalance valve" and affirmed that the incident at issue here would *not* have occurred with the snubbing units that did not have counterbalance bypass . (See ECF Nos. 143-10, at 28–38; 143-11, at 65–66.) Jeremy Lawrence, a CRW hydraulics expert, similarly stated that CRW learned "from this incident" that the counterbalance bypass was a "bad idea" because of the potential for a traveling plate to fall if a hose was disconnected. (See ECF No. 154-1, at 44–

46.) Thus, the testimony of CRW's own witnesses would support a jury conclusion that if the counterbalance was functional and not bypassed, the incident would not have occurred, that the CRW-inserted bypass disabled the counterbalance, that the inclusion of the bypass rendered the unit defective, and that there were insufficient warnings as to these risks, any or all of which rendered the product defective.

The Court also is not certain that expert testimony is necessary to help the fact finder determine these matters. Fed. R. Civ. P. 702. Based on these facts of record, it is plausible that a lay person could rationally understand the basics of the design and mechanics of the Snub Unit and, importantly, the corresponding risks involved in the interplay of the counterbalance and the bypass. Beyond that, as noted below, Plaintiff's expert witness, Mark Mazzella, will be permitted to testify based on his considerable experiential knowledge about snubbing units and operations. The Court concludes that there is sufficient evidence in the record for a jury to determine that Snub 10 was defective under each of the theories advanced.

**2) There Is Enough Evidence in the Record for a Jury To Determine That CRW Designed Snub 10.**

CRW also argues that it cannot be held strictly liable in part because "the undisputed facts establish that CRW did not design Snub 10." (ECF No. 142, at 10.) More specifically, CRW argues that it "reverse engineer[ed]" Snub 9, which was originally designed by a different company, and the counterbalance bypass valve was "requested by DWS." (*Id.*)

It is undisputed that the original design for Snub 10 came from the design for Snub Unit 9, which was designed by a company called Snubbertech. (ECF No. 141, ¶ 8.) It is also undisputed that the original design for Snub Unit 9 did not include a counterbalance system and that CRW added a counterbalance to Snub 10. (ECF No. 189, ¶¶ 219–20.) Finally, it is undisputed that DWS

requested that CRW later add a bypass on the counterbalance system after Snub 10 was sold and ultimately delivered and CRW complied with this request. (ECF No. 141, ¶¶ 16–18, 21.)

CRW attempts to rely on the fact that they reverse engineered another company's design to create Snub 10 to argue that cannot be held liable for a design defect. However, by taking the design of Snub Unit 9 and "reverse engineering it," CRW effectively took on the design of the unit as its own. Additionally, CRW then designed and added two features to the Snub 10 which were not in the design created by the other company: a counterbalance system when it first built Snub 10, and then a bypass around that counterbalance system when it took the device back and reconfigured to include that bypass. These added features required CRW to analyze and determine "the overall plan of construction and operation" of Snub 10. *See Coba v. Ford Motor Co.*, 932 F.3d 114, 122 (3d Cir. 2019) (defining "design" in the product-liability context as "the overall plan of construction and operation") (quoting *Lombard Corp. v. Quality Aluminum Prod. Co.*, 261 F.2d 336, 338 (6th Cir. 1958)). The Court thus concludes that, for purposes of strict products liability, a jury could readily find that CRW did design Snub 10, the first time around, then again after the bypass was added, or both.

The Court also is not persuaded by CRW's argument that the addition of the bypass valve constitutes a "substantial modification" that was "not foreseeable to CRW." (ECF No. 169, at 4.) CRW highlights that "plaintiff does not cite to any cases where a court rejected a substantial modification argument because the manufacturer was the party that made the modification to a product that was requested by the consumer." (*Id.*) However, the argument that CRW should escape liability because it was following the request of the customer, DWS, is illogical and contrary to purposes of strict product liability principles, which is to encourage designers and manufacturers to review the safety of their products. It is also disingenuous to argue that the

addition of the bypass valve was not foreseeable to CRW. The bypass valve was designed and installed by CRW, the seller of the product and not by some unrelated aftermarket user. The principle of "substantial modification not foreseeable to CRW" surely has no application here. The Court thus concludes that a jury could readily conclude that CRW designed Snub 10 with all of the features, including the bypass valve, such that it could be found to be strictly liable for any defects in Snub 10.

### 3) There Is Enough Evidence in the Record for a Jury To Determine That CRW Failed To Warn End Users of the Hazard Related to the Bypass Valve.

It is undisputed that the product manual for the Snub 10 does not contain any reference to the counterbalance bypass. (ECF No. 154, at 8 (citing Snub 10 Equip. Manual, Appx. 13).) CRW argues that Plaintiff's strict product liability failure to warn claim should nevertheless be dismissed because "there can be no causal connection to not putting something else in a Product Manual if the plaintiff never saw the Product Manual to begin with." (ECF No. 142, at 11.) CRW argues that Jones never saw the product manual by highlighting the fact that *Mr. Monroe* testified that he never saw the product manual for Snub 10. (*Id.*) This fact does not address whether Jones read the manual. Further, the Court concludes that the fact that Jones's colleague did not read the product manual does not absolve CRW from its duty to present "complete and accurate" information "to protect against foreseeable risks of harm" in a way that is "reasonably likely to notify the actual user." *Binder v. Jones & Laughlin Steel Corp.*, 520 A.2d 863, 867 (Pa. Super. Ct. 1987) (citing *Dougherty v. Hooker Chemical Corp.*, 540 F.2d 174, 179 (3rd Cir.1976)).

CRW further argues that "CRW's sharing of the updated hydraulic schematics to Steve Byra [a DWS field supervisor] sufficiently communicated the modification of Snub Unit 10 to Deep Well, especially since the installation of the counterbalance bypass was specifically requested by Deep Well representatives." (ECF No. 169, 6–7.) The question of whether this

11

communication between CRW and DWS fulfills CRW's duty to disclose risks to the end user is not definitively answered by the record such that CRW is entitled to judgment as a matter of law. *See Dougherty*, 540 F.2d, at 182 (stating that "a jury could have found that [the employer] had not exercised reasonable care in informing [employees] of all [] dangers" and thus concluding that "it is the jury's function to determine . . . whether [employer's] knowledge, if any, could have relieved [manufacturer] from any requirement to warn [] employees and thus, from any liability").

Given the fact that the counterbalance bypass was left out of the Snub 10 product manual, and that any necessary or appropriate warning could occur or be placed outside of the product manual in any event, the Court concludes that there is genuine issue of material fact regarding whether CRW fulfilled its duty to warn the end users about the risks associated with this system. Further, the Court concludes that on this record, a jury, not the Court, should be tasked with determining whether CRW's communication with DWS fulfills this duty.

### 4) CRW Delivered Snub 10 to DWS With the Bypass Installed.

CRW also places great weight on the timing of the manufacturing and design processes. Specifically, CRW argues that it cannot be strictly responsible for the bypass valve on the counterbalance because "[t]he modification, the installation of the bypass valve, occurred after the sale of Snub 10 to Deep Well and after Snub 10 was delivered and in the possession of Deep Well, not CRW." (ECF No. 169, at 4.). In other words, CRW claims that this timeline shows that the product had already "left [CRW's] hands" when the bypass valve was added. *See Igwe*, 258 F. Supp. 3d at 609 (explaining that a successful strict product liability claim requires that "the defect existed when [the product] left the defendant's hands").

The Court concludes that this distinction in timing is immaterial. The undisputed facts are that to fulfill DWS's request, CRW took Snub 10 back from DWS, added a bypass on the

counterbalance system, and re-delivered the snubbing unit to DWS. (ECF No. 141 ¶¶ 16–18, 21.) The Court concludes that when CRW took the unit back to install the bypass, the product was effectively back in the "hands" of CRW for further manufacturing and the relevant delivery to the customer here is the delivery after the bypass valve was added.

5) **The Record Supports a Conclusion That Jones and Monroe Were Intended Users of the Snub 10 and It Was Not Being Misused.**

CRW further argues that it cannot be subject to strict product liability because "Snub 10 was not being put to its intended use, and was not being serviced by an intended user" when the incident occurred. (ECF No. 142, at 12–13.) In Pennsylvania, strict product liability will not apply if there is an unintended use or an unintended user. *Bartkewich v. Billinger*, 247 A.2d 603, 605 (Pa. 1968). The court makes the threshold determination of whether a product is being used as intended by an intended user. *Metzqar v. Playskoll Inc.*, 30 F.3d 459, 464 (3d Cir. 1994). "Intended user must be determined in the context of the knowledge and assumptions of the ordinary consumer in the relevant community . . . absen[t] explicit warnings." *Id.*

CRW argues that Monroe and Jones were unintended users of the Snub 10 during this maintenance operation. CRW supports this claim with three statements from the Snub 10 product manual: (1) "only qualified personnel should be authorized to operate and perform maintenance on this equipment," (2) "Do not attempt unauthorized disassembly or maintenance of components," and (3) "contact your CRW representative for further information." (ECF No. 142, at 13.) CRW argues that Monroe and Jones were not qualified personnel because, as to Monroe specifically, he had "no hydraulic experience" and "had never replaced a hydraulic line on a snubbing unit." (*Id.*)

The Court concludes that this line of reasoning is misplaced. Monroe and Jones were employed by DWS to operate snubbing units at the Kinnan Well, including Snub 10 (ECF No. 140

13

¶ 3), which makes them plainly foreseeable users of the Snub 10. Additionally, Plaintiff provided evidence to contest whether Monroe was or was not qualified to perform hydraulics troubleshooting by DWS (*see* ECF No. 189 ¶¶ 71, 90, 92, 182), thereby also making him an intended user within the language of the product manual. In any event, the Court concludes that, at a minimum, Monroe and Jones are not "obviously unintended" users of the snubbing unit (including repairing it) such that CRW is "obviously exonerated" from potential liability. *Metzqar*, 30 F.3d, at 465.

CRW also asserts that Snub 10 was being used in an unintended manner (ECF No. 142, at 14) because Jones and Monroe should not have been performing maintenance on the unit (per the product manual) and, more specifically, "there was no reason to remove or to disconnect the hydraulic line which held the jack in order to accomplish DWS's troubleshooting task . . . ." (ECF No. 141 ¶ 68.) CRW argues that the actions of Jones and Monroe—particularly Jones' action of stepping underneath the raised jack—was unforeseeable and created an "extraordinary risk" such that CRW cannot be held strictly liable. (ECF No. 142, at 15 (citing *Bartkewich*, 247 A.2d at 606 ("Appellant was entitled to believe that the machine would be used in its usual manner, and need not be an insurer for the extraordinary risks an operator might choose to take.")).)

The Courts finds this question to be a closer call, but ultimately concludes that performing maintenance on the Snub Unit is not an "obvious misuse" nor was it "clearly warned against" such that CRW is "obviously exonerated." *Metzqar*, 30 F.3d, at 465. Considering foreseeability in the "narrow" sense as articulated by the Third Circuit in *Metzgar*, it is more than arguably foreseeable that snub employees would endeavor to troubleshoot a malfunction, even if CRW could not have foreseen that Monroe and Jones would undertake maintenance of the unit in the precise manner they did (by disconnecting the hydraulic hose while the bypass was activated and standing under

the jack assembly). *See id.* ("Thus, although foreseeability is not a term that should be associated with strict liability, the concept, to the extent it implies an objective test, is not entirely foreign to a strict liability analysis, although it is applied in a more narrow sense than in negligence law.")

As to CRW's argument that Monroe and Jones acted in a way that was unforeseeable and reckless, the Court finds that this situation is importantly different from *Bartkewich*. CRW cites *Bartkewich* to support the argument that Snub 10 was not being used as intended and Monroe and Jones created an extraordinary risk by troubleshooting the unit in the way they did. (ECF No. 142, at 15.) In *Bartkewich*, the plaintiff, a glass factory worker, put his hand in the machine in an attempt to fix a jam and prevent damage to the machine. 247 A.2d at 604. The supreme court held that the manufacturer of the machine was not strictly liable because the plaintiff created an extraordinary risk by reaching his hand into the machine.

The situation here differs from that in *Bartkewich* because it is not obvious that Monroe and Jones were aware of the potential hazard created by their actions. In *Bartkewich* the glass worker "knew there was no guard rail, and certainly should have appreciated the danger of placing his hand in an operating glass-breaking machine." 247 A.2d at 606. In contrast, here, there is no evidence that Monroe and Jones knew that their actions would result in the jack assembly descending suddenly in the manner that it did. (*See* ECF No.154, at 3–4, 20, 22 ("Steve Monroe, the Deep Well operator on Snub 10 at the time of Marc Jones' death, was not actually aware of the counterbalance bypass.") In fact, CRW acknowledges in its Brief that "Monroe and Jones [] decided . . . to disconnect a hydraulic line that Monroe knew went to the jack handle, but [Monroe] *did not know* what would happen if he disconnected it." (ECF No. 142, at 5–6 (emphasis added).) CRW thus cannot show with the record evidence as a matter of law that Jones "knew or had reason to know of facts which created a high degree of risk of physical harm to himself or that [they]

15

deliberately proceeded to act, or failed to act, in conscious disregard of that risk. *Charlton v. Toyota Indus. Equip.*, 714 A.2d 1043, 1047 (Pa. Super. Ct. 1998) ("To demonstrate that a plaintiff's actions are highly reckless, it must be shown that he knew or had reason to know of facts which created a high degree of risk of physical harm to himself or that he deliberately proceeded to act, or failed to act, in conscious disregard of that risk.")).)

By concluding that (1) there is sufficient evidence—CRW's own employees' depositions, other facts of record, and Mr. Mazzella's expert opinion—for a jury to find that Snub 10 was defective because of the functioning of the bypass valve and/or because of the failure to warn against the use of the bypass valve in the circumstance in which this incident occurred; (2) that the jury can readily conclude that CRW did design and deliver Snub 10 with the relevant counterbalance and bypass valve installed; and (3) that Monroe and Jones were intended users and were operating in an intended (not reckless) manner, (or at least not "unintended" users engaged in an "unintended" use) the Court concludes that CRW is not entitled to judgment as a matter of law and thus DENIES its Motion.

## III.   CRW'S MOTION FOR SUMMARY JUDGMENT ON SHELL'S CROSSCLAIM

Shell had asserted crossclaims for indemnity and contribution against CRW, and vice versa. (ECF Nos. 40, 47.) Each moved for summary judgment as to all such crossclaims asserted against them by the other (ECF No. 144-1, ¶¶ 12–16; ECF No. 140 ¶ 10). As to contribution, the basis by which each of them sought summary judgment was that they could not have liability to the Plaintiff, and therefore would not be a tortfeasor at all, and therefore could not be liable for contribution as a tortfeasor. (*See* ECF Nos. 142, 182.) Given the Court's denials of summary judgment as to CRW as to the claims asserted by the Plaintiff, these mutual bases for summary

judgment evaporate, so the summary judgment motion of CRW as to the contribution crossclaim must be DENIED.

As to indemnity, "[t]o make out a claim for common law indemnification, [one defendant] must demonstrate that without active fault on [its] own part, [that defendant] has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of [the other defendant], and for which [it] is only secondarily liable." *Bank v. City of Philadelphia*, 991 F. Supp. 2d 523, 537 (E.D. Pa. 2014). "[I]ndemnity is available only (1) where there is an express contract to indemnify, or (2) where the party seeking indemnity is vicariously or secondarily liable for the indemnitor's acts." *Id.*

Both Shell and CRW agreed that there was not contractual relationship between them that could support any claim for contractual indemnity, and as such, there is no basis to support any crossclaim of CRW for contractual indemnity. (ECF No. 144-1, ¶¶ 14–16; ECF No. 142, at 25–26.) Further, the Court concludes that CRW is correct that the claims for liability asserted by the Plaintiff against it are direct and independent, and are not based on the status of Shell or CRW relative to one another, and no asserted indemnity liability is in essence derived from the status of Shell or CRW relative to the other, which could generate primary and secondary liability of either of them. Thus, the record does not reveal any basis by which either Shell or CRW could be liable to the other for indemnity based on a relationship between them, or some version of primary/secondary liability derived from the status of either one of them relative to each other, or to the Plaintiff. Consequently, there appears to be no basis for CRW to successfully assert an implied indemnity claim against Shell, so that claim of CRW will be DISMISSED.

**IV.**    <u>**CRW'S MOTION TO STRIKE PLAINTIFF'S EXPERT, MARK MAZZELLA**</u>

CRW moves the Court to preclude the testimony of Plaintiffs' expert, Mark Mazzella, under Federal Rule of Evidence 702, which amounts to a challenge made under the Supreme Court's landmark decision in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). (ECF No. 138.)

    **A.**   <u>**Standard of Review: *Daubert* Motion**</u>

In acting as a gatekeeper in a Rule 702 inquiry, the Court must screen purportedly scientific evidence and ensure that any and all such proffered evidence is both relevant and reliable. *Daubert*, 509 U.S. at 589, 597. This gatekeeping function also arises when an expert is offered to provide technical evidence related to the engineering field. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). The Court's inquiry is one of flexibility wherein the focus rests solely on the principles and methods used by the expert, not on the conclusions drawn from them. *Daubert*, 509 U.S. at 594–95.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In determining the admissibility of expert testimony, courts have categorized the Rule 702 requirements as (1) the expert's qualifications, (2) the reliability of the expert's methods, and (3) the "fit" of the expert's methods to the facts of the case (i.e., whether the expert's methods are helpful to the fact finder). *See In Re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741–43 (3d Cir. 1994) (*Paoli II*).

### B. **Discussion**

#### 1) **Qualifications**

In order to qualify as an expert witness, the witness must possess relevant specialized expertise. *Id*. at 405. The Court has considerable latitude in determining whether a witness qualifies as an expert. *See Id.* at 741. Our Court of Appeals has held that a broad range of knowledge, skills, and training may qualify a witness as an expert. *Id.* (citing *Paoli I*, 916 F.2d 829, 855 (3d Cir. 1990)). The question of whether an expert is qualified or not centers around whether they have "specialized knowledge" which can be "practical experience as well as academic training and credentials." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (internal citations and quotations omitted).

CRW asserts that Mr. Mazzella does not even meet this low bar of qualification as an expert witness because Mr. Mazzella lacks education and formal training on the design and manufacturing of snubbing units. (ECF 139, at 6.) While it is true that Mr. Mazzella has minimal formal education, the Court concludes that his thirty (30) years of experience in the snubbing industry qualifies him as an expert with the required specialized knowledge. (Mazzella Report, ECF No. 154-4, at 24–29.) More specifically, as Plaintiff articulates in her brief, Mr. Mazzella has numerous experiences that have generated a specialized knowledge on the design, manufacturing, and safety of snubbing units. (*See* ECF No. 156, at 5 ("In his thirty years of experience in this industry, Mazzella has designed a snubbing unit for which he holds a patent; has assembled and re-manufactured snubbing units; has authored or contributed as an author to three different Snubbing Unit Operating Manuals; has worked as BP's world-wide snubbing technical authority, and, in that position, has provided expert opinions on safety barriers for snubbing units.").)

The Court concludes that Mr. Mazzella is a qualified expert for purposes of satisfying Rule 702. Thus, as an expert in snubbing units, Mr. Mazzella is qualified to render an opinion in this case as to the design and safety of the Snub 10.

### 2) Reliability

Under *Daubert* and its progeny, expert testimony is admissible so long as the process or technique that the expert relied upon in formulating an opinion is reliable. *Daubert*, 509 U.S. at 589; *see also Paoli II*, 35 F.3d at 742. In other words, the expert must have good grounds for the opinion, which must be based on the "methods and procedures of science" instead of a "subjective belief or mere conjecture." *Daubert*, 509 U.S. at 590.

The Third Circuit instructs trial courts to consider the following factors in evaluating whether a particular methodology is reliable, based on *Daubert* as well as the Third Circuit case *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985): "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 247–48 (3d Cir. 2008). However, these factors are not the only means by which a trial court can find a particular methodology reliable and find the expert's testimony admissible, and some factors may have more or less applicability depending on the type of opinion and issue involved in the case. *See, e.g.*, *id.* at 248; *Kumbo Tire*, 526 U.S. at 150.

CRW argues that Mr. Mazzella's testimony is inherently unreliable because Mr. Mazzella "admitted that there is no support for his opinions and that he relied upon no literature, written standards, or research in forming his opinions." (ECF No. 139, at 10–11.) Several courts have held that the *Daubert* factors such as peer review, publication, and potential error rate—which CRW relies on heavily— "simply are not appliable, [when] the reliability of testimony from a practical expert depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Elgert v. Siemens Indus., Inc.*, No. CV 17-1985, 2019 WL 1294819, at *5–6 (E.D. Pa. Mar. 20, 2019) (citing *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (internal quotations omitted). In other words, when an expert's practical experience guides the relevant opinion, as is the case with Mr. Mazzella, "he also does not have to obtain general acceptance or peer review to provide a reliable opinion." *Id.* at *6.

The Court concludes that it is not dispositive that Mr. Mazzella does not meet the traditional indicators of reliability, such as conforming to industry standards. The Court concludes that, based on his professional experience, Mr. Mazzella can reliably "explain[] the functioning and purpose of the counterbalance valves" on the Snub 10 (ECF No. 156, at 2), in a way that uses his specialized knowledge to assist the fact finder in its role. Additionally, Mr. Mazzella's decades of practical experience in designing, assembling, and technically analyzing snubbing units, authoring operating manuals, and consulting with another petroleum company about them (*id.* at 5), enables him to reliably analyze the Snub 10 using his experience, and the facts in the record, including the testimony of CRW's witnesses, Caleb Fulks and Jeremy Lawrence. (*See id.* at 6.)

**3) Fit**

Rule 702 requires that an expert's testimony assist the trier of fact in resolving a factual dispute. *Daubert*, 509 U.S. at 591. In other words, an expert's testimony passes the "fit" test if

21

there is a clear, valid scientific connection between the expert's opinion and the particular disputed factual issues in the case. *Meadows*, 306 F. App'x at 790; *Paoli II*, 35 F.3d at 742-43. Even if an expert's testimony is based on considered scientific or technical knowledge, the testimony will be excluded if it is not knowledge related to the purposes of, or pertinent inquiry to, the case. *Paoli II*, 35 F.3d at 742-43. Additionally, an expert's opinion must be supported by some factual foundation to satisfy the "fit" requirement. *Meadows*, 306 F. App'x at 791 (citing *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002)).

The Court concludes that this factor is met with respect to Mr. Mazzella's testimony. Mr. Mazzella opines on whether Snub 10 was defectively designed because of the bypass valve and whether Snub 10 had effective warnings. (Mazzella Report, ECF No. 154-4.) To draw these opinions, Mr. Mazzella reviewed industry reports and the depositions submitted in this case. (*Id.* at 34.) The Court concludes that this method of analysis by Mr. Mazzella in the context of his own extensive experience sufficiently encompasses the facts of this specific case and enables Mr. Mazzella to offer an opinion that can rationally assist the factfinder in this case. There is sufficient "fit" as to his testimony and opinions and this case.

The Court concludes that Mr. Mazzella can testify as an expert witness and CRW's Motion to exclude him is thus DENIED.

## V.    <u>CONCLUSION</u>

For the reasons explained above, the Court concludes that CRW has not met the burden of demonstrating it is entitled to judgment as a matter of law as to the claims asserted by Plaintiff and as to the crossclaims asserted by Shell. Additionally, Plaintiff has proffered sufficient evidence to show that the testimony of its expert, Mr. Mazzella, meets the requirements for admissibility under

*Daubert* and the Federal Rules of Evidence, meaning that CRW's Motion to Strike Mr. Mazzella fails.

The Court DENIES the Motion for Summary Judgment filed by CRW (ECF No. 140) and the *Daubert* Motion to preclude the testimony of Plaintiff's expert Mark Mazzella, filed by CRW (ECF No. 138).

An appropriate Order will issue.

s/ Mark R. Hornak<br>
Mark R. Hornak<br>
Chief United States District Judge

Dated: December 1, 2022